courtroom. Does that work okay, Sandra? Yes, thank you. Good, okay. All right, we'll start with our first case, Grassmeyer v. Shred-It USA. Good morning, Your Honors, Stephen Wicks on behalf of the appellants. I would like to reserve two minutes for rebuttal, if I may. Your Honors, we're here on two causes of action that were dismissed by the appellants, and the second for a hostile work environment. The appellants contend that the lower court erred, and when it got to the point of examining the other evidence of discrimination that was brought forth by the appellants, the court erred in terms of its analysis of that evidence and its conclusions that there was no evidence of a discriminatory animus. And then, in looking at the hostile work environment case, we contend that the court failed to look at the the facially neutral evidence when examining that larger picture. How do you get a hostile work environment claim under ELERTH? How do you have sufficient notice to the employer and a failure to act, if you will? Your Honor, as I will explain, Mr. Lespina, who was the general manager, we contend was, in effect, the leader of what was described by Mr. Milovic as a men's club. He was making the decisions on the territory allocations, he made the decisions on the training, he made the decisions on the discipline, and he was present... But what was he privy to, as a matter of fact, in terms of... I mean, a lot of this revolves around Mr. Mitchell's behavior. Well, I would disagree in this sense that Mr. Lespina admitted that he was responsible for the territory allocations. We're just asking about the hostile work environment at this point. Yeah. Your Honor, as I understand it, and I'll go to that and come back, because I believe that the neutral, the facially neutral behaviors are part and parcel of that claim. In terms of the more explicit behavior, the testimony was that a lot of that occurred in sales meetings, that Mr. Lespina was at the sales meetings, so he was present and had every opportunity to see what was going on and took no action to intervene. So, and the... If you like, I can go into the explicitness of it, but he was there in those meetings and that was one of the central points where, for example, Pat McGrain contends that she was ridiculed in those meetings. Ms. Grassmeyer doesn't even make hostile work environment claims, right? That's correct. She was a remote site player in the game. Okay. So, if she has not made a hostile work environment claim, how can there be constructive discharge? Well, in her circumstance, I would submit, Your Honor, that number one, she saw her position posted on the Internet and... She saw her territory posted on the Internet. Well, and I submit to you that it was her position because that territory, number one, look at what Ms. Lentz said. There was never an occasion, and she was responsible for the advertising, there was never an occasion where they advertised a position where there wasn't an opening. And after this, after Ms. Grassmeyer resigned, they did nothing differently with the territory. They filled it with the mail. Assume that's true and a jury would say, okay, they have a territory and maybe they were going to be letting her go. But there was, the district court's view of this is, and I didn't see anything different, maybe you can point us to something, that there was that, and she was unhappy about Ms. McGrain leaving, and she received emails that went to everybody that she thought were aggressive in saying ship up or shape out, get your sales, and she didn't like the use of the word team because she thought that was mail-oriented. That were, that was the set of facts the district court said was in play. Are there other facts? There are, Your Honor. What else can you point to that affected Ms. Grassmeyer or that she said created a hostile work environment? There was a sequence of the three terminations of the last, the preceding terminations for McGrain and for Ryan. My client was the last, Ms. Grassmeyer was the last female on the sales staff out on the sales representatives. Ms. Lentz, who was inside, did take some phone calls. Ms. Grassmeyer was given a performance evaluation that, where it was indicated to her it was a, an action plan, but then she was told to ignore it, and that, in her mind, signaled that something was seriously wrong. So, on the heels of, and in, on the heels of the prior two terminations. So you, you believe that that creates a circumstance that is so that any reasonable person could manage through it. They would, any reasonable person would feel compelled to resign under those circumstances. I, I believe that when you get to the point of seeing that the pink slip is all but delivered into your hand. And that's, and that is, that was the, the advertisement of her position was the culmination of those series of events that, in effect, signaled to her the end was here. So the question for the court, and we are submitting to the court that the answer is favorable to her, is that she doesn't have to wait until the slip is handed to her, where everything she's getting says that that's the way this is going to turn out. So how, how does that differ from, what puts it over the line from being someone foreseeing that they're going to be terminated? And how, how does it, how does it compel you to then leave? Part of the compulsion, Your Honor, is that. Meaning you can't stay there another day, because the situation is such that you can't stay another day as compared to, I'm going to be terminated, so I'm leaving. Well, in a sense, timing could be everything. Because there is a, there is a Is there any case, do you have any case at all that says wanting to avoid the stigma of termination is a, is a factor that creates an intolerable situation at work? I do not, Your Honor. Yes. But your, but your position does depend upon a legal equivalence between I'm about to be fired and things here are so bad I can't work another day, right? Yes. Okay. Yes. Would you address what you believe the evidence shows with respect to the autos, the monthly autos produced by plaintiffs versus males? Yes, Your Honor. The, when you look at the autos, the highest producing autos were in the concentrated territories in Montgomery and Allegheny County. That would be with Mr. Stevens and Mr. Vanduul. Mr., in, in 2005, which is the period we looked at, McGrane was fourth, I believe, on the list, and Papsen was fifth behind her. The, the other two plaintiffs, Grassmeyer and Ryan, were admittedly at the, essentially at the end of that list. And, but we believe, Your Honor, that the state that the significant evidence regarding the manner in which territories were allocated and who got the territories that were most productive has to be considered when looking at the outcome on the autos because... Although the, those, there's lots of testimony to the effect that, you know, Pittsburgh and Allegheny County were, were more difficult territories. Well, we, we submit it's an issue of fact because there were two gentlemen who testified, Mr. Milevec and Mr. Peters, who had downtown territories and had, in Mr. Milevec's case, he had, he had also a green tree, and they both testified just the opposite. They said from their perspective that because of the rigorous criteria that needed to be met for purposes of, of meeting the quota, a more concentrated territory was better. But what is there about the allocation of territories that gives us, gives rise to the inference that there was discrimination based on gender? Both with respect to the allocation, with respect to the movements with, on the territories, and with respect to notice that was given for an opportunity to apply for those territories. If you look, Your Honor, at the allocation of the territories, Mr. LaSpina admitted that Pittsburgh, Allegheny County, and essentially Montgomery County or Westmoreland County would have been the preferred territories because Pittsburgh had the most revenue. All right, it would have been preferred, but again, what do we have to show that those allocations were based upon gender? I mean, we don't have the women saying, I want those territories. We have just the opposite. In a sense, they said, they both testified that we weren't told about opportunities and we weren't told that we could apply for them. Do you have to be told? Was there evidence from the men that the men were told to apply for them? Yes. Mr. Peters has testified that he was told that he could apply and Was that because he had a better history of performance? No, Your Honor, it wasn't. In fact, when you look at the evidence across the record here, there's absolutely no assertion made when the territories were allocated that it was done because the gentlemen used that because we believe the preferred territories were in the city and the county, that they were chosen over the plaintiffs because they were better salespeople. That wasn't the case. And coming back, Judge Rendell, to the issue of territory allocations, the only slice of the better-tasting pie, as the plaintiffs would characterize it, that was doled out went to Ms. McGreen, and that was in the Green Tree area that Mr. Milovic said would be harder than the downtown because it was more dispersed. Look at how that was taken away. Dennis Milovic testified that when he was given the Green Tree territory, he was told by Mr. Vanderwood to be hush-hush about it. Why is that gender-based? If you're taking something away from somebody, isn't it just kind of natural in a work environment to say, look, I'm moving this responsibility to you, don't mention it, let me deal with how to break the news? Well, but it wasn't dealt with that way, and the reason I contend that and we contend that it's gender-based is that if you look at the whole picture, not at each piece of evidence, the picture that emerges is that there was a pattern in terms of the allocations. For example, Ms. McGreen didn't know that her territory was being taken away. Now, the question that arises there is why would, as you've indicated, Judge Jordan, why would a boss do that and not say to the affected employee, here's what I'm doing? She found out about it when she found Mr. Milovic in her territory. It could be poor management, but is it biased management? That's the question. How do you tie that to gender and not just Mr. Lispina maybe being less of the diplomat than he should be in managing the affairs of the office? The way we tie it to gender is to look at, for example, what happened with training, to look at the atmosphere at Shredded in terms of what Mr. Milovic described as a men's club atmosphere. So you acknowledge it's facially neutral. You only get to discrimination with it by saying it's a part of something overall. That's correct, Your Honor. When you look at training, and I think training is probably the best example of that, there was a significant difference in terms of what was provided to the plaintiffs as compared to the men who were coming in at that same time. Mr. Bowser, as an example, and he's probably a good example, was permitted to shadow the two best salesmen in the company. That would be Mr. Stevens and Mr. Vanduul on their sales calls, and they went with him on his sales calls. Now, when the whole idea in this company is to generate sales and to make sure, I would assume, if decisions are being made with some degree of rationality, to inculcate the skills into the employees, that Mr. Vanduul and Mr. Stevens would have been made available to the plaintiffs. They weren't. Mr. Mitchell accompanied Mr. Stevens two times a month as long as he was his supervisor. The purpose of that being to train and make sure that they knew how to get the job done. Mr. Mitchell permitted Mr. Bowser to shadow him on quite a few of his own appointments and rode with him on Mr. Bowser's appointments. And the plaintiffs' appellants at this point have testified that they were, and I'll do one more comparison with Mr. Milovic and his appellant, Mr. Mitchell. The concluding point from our perspective would be, it's a larger picture. We ask the court to take a look at it in that context, not to dice it up and analyze each one separately. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. My name is Greg Pinsky and I represent the defendant, Pelley Shreddit, USA, in this appeal. Your Honors, I submit that there's three very simple reasons that the lower court's decision should be upheld. The first being that this court's decision in Simpson v. Kay Jewelers is absolutely controlling and directly on point to the plaintiffs' disparate treatment gender discrimination claim. Secondly, the second and third reasons are both judicial admissions that were made by the plaintiffs, the first one being at the lower court. And as the district court noted on page 19 of its order, the plaintiffs admitted with regard to the hostile work environment claim that the locker room talk in and of itself does not constitute a hostile environment. And what they've done by making that judicial admission is tie the hostile environment claim to the disparate treatment claim. So if there's no disparate treatment, then by the plaintiff's own admission, there's no hostile work environment. Where in the record you say that the district court said that on page 19 of its decision, but where in the record is the admission by the plaintiffs that the vulgarities of Mitchell and his supervising colleague were not in and of themselves actionable? It's on page 15 of the plaintiff's summary judgment brief to the lower court, Your Honor. The third... Where's that in the appendix, if you know? I don't have the appendix site, Your Honor. I can find that and... All right, we'll find it. Okay. The third reason, and I'll go back and elaborate on these, but the third reason and the second judicial admission was made to this court on page 17 of the appellant's brief in which they told this court that, and admitted, that Mr. Mitchell engaged in this conduct regardless of who was present. And that's a quote, regardless of who was present. Now, if Mr. Mitchell is... If somebody sexualizes the atmosphere of the workplace and it's patently offensive to women, the fact that there are some guys in the room makes it non-actionable? It makes it less actionable, Your Honor, in the sense that it's virtually impossible to meet the because of sex requirement, the very first prong of a hostile environment claim. When you have someone who is not targeting their harassment or their conduct at a person because of their gender, but rather is engaging in this conduct as part of office banter and... The content of what they say could be clearly gender-based. And in fact, the fact that men are present could exacerbate rather than make more innocent the conduct, could it not? It very well could, Your Honor. Yes, I would acknowledge that. Okay. So guys in the room doesn't make really a big difference if Mr. Mitchell is walking around calling women bitches and hoes, right? It's not a legal defense to say there was a guy in the room, too. No, it's not a legal defense, but what I think it needs to be put in the context of, Your Honor, is it needs to be put in the context of whether or not this is severe and pervasive. And what it comes down to is that if this conduct is being directed not at the plaintiffs because they're female, but just simply because this language is being used in the office, then that makes it less actionable than, for instance... Isn't your best argument that it's not... First off, it's not severe and pervasive, not whether there are men and women in the room? It is, Your Honor. That's exactly the point I'm trying to make, and you said it more succinctly than I did, but I guess what I'm saying is that it's less actionable and less severe and pervasive if it's not being directed at a particular employee because of their gender. There's a lot of stuff here, just a lot of stuff going on, a lot of things. How does it not add up to enough to get past summary judgments? How do you chip away at all of the stuff to say, you know, there's just no way? Well, the first reason that there's no disputed issue of fact here is based on the strategy that the plaintiffs have adopted with their claims by pegging the sexual harassment claim to the gender discrimination claim, and that's the point that I made. Leave the sexual harassment piece, the hostile work environment out, and just focus, if you would, on what I take to be Judge Rendell's question, which is, looking at this in the light most favorable to the plaintiffs, why isn't it enough for them to say, hey, the supervisors for training, we didn't. The guys got better territory, we didn't. The guys were cut slack on their numbers, didn't get action plans, weren't put on a short leash, and when we fell short, all that happened to us. Why isn't that, in the light most favorable to the plaintiffs, enough for Ryan and McGrane's claims of discrimination, regardless of hostile work environment, to survive summary judgment? Primarily, Your Honor, because my client fired employees with equal opportunity, and the statistics support that. There was 36 sales reps, 11 of them. Over five years? Over five years, yes. And my question then, I mean, I know the district court said in the relevant time period, but what's relevant about a five-year time period if the employees that are complaining are there, respectively, a year and less than a year? For them, the relevant time period is when they're there, isn't it? No, Your Honor, because of the, and the appellants argued this for the first time in their appeal, that it wasn't an appropriate comparison group, but the argument they made actually supported us. And here you have the same supervisor making the decisions. You have the same supervisor who's doing the hiring. Lespina? Lespina hired every single one of those 36 sales representatives. Doesn't the record reflect that the direct supervisors weren't around for that five-year period? They were there when these people were there. The training issues were with those supervisors who were there when they were there, not the five years generally, but for Ryan and McGrane. The only person, well, the only person who had the authority to make a decision to terminate the employment was Mr. Lespina. And Mr. Lespina is the one who terminated all three of the plaintiffs. It was no one else, only Mr. Lespina. You mean two of the plaintiffs? Two of the plaintiffs. I mean, I just lumped Ms. Grassmeyer in there just simply because she claims it was a constructive discharge, so it was his conduct. But you're not acknowledging that, I think. No, and we pointed that out in our brief. So with that in mind, Mr. Lespina is the one who was there, and as Mr. Wicks acknowledged when he was up here, it was Mr. Lespina was the one who scheduled the ride-alongs. It was Mr. Lespina who scheduled the training. It was Mr. Lespina who assigned the territories. So other than the hostile environment claims, which revolve around Mr. Mitchell, everything else revolves around Mr. Lespina. And the fact remains that Mr. Lespina, as the general manager, was the person who hired all 36 of the sales representatives. He's the one who fired 11 of those 36 sales representatives, seven men and four women. It was his decision. He's the one who is engaging in that. And even – Let's assume for discussion that we accepted that that's true, that Lespina was acting alone, that this wasn't, as the plaintiffs seemed to indicate, not Lespina acting alone, that in fact Mitchell and – how do you say the gentleman's – Vanial, is that how it was – they seemed to imply that Mitchell and Vanial were very prominent independent actors in the sense that scheduling ride-alongs and getting feedback, that wasn't going through Lespina, that was going through Mitchell and Vanial. But leaving that aside and taking your assertion that it was all Lespina all the time, how does the fact that 11 – seven out of 11 people fired undercut the specific assertions that the plaintiffs are making that when you look at our numbers and you look at the numbers of the men who were working the same time we were, we were held to a more rigorous and intense standard and not cut any slack when we didn't make our numbers? The evidence doesn't support that, Your Honor. I mean, the objective sales data does not support that and the terminations do not support that. And even – let's just put aside the five-year period. Let's just look at people who worked there at the same time. As the district court pointed out, Mr. Peters, who didn't meet his numbers, was terminated as well, but the district court didn't point out that there were other men who were terminated as well, like, for instance, Eric Wirtz. Mr. Wirtz was employed by Shreddick from January 10th of 2005 to April 4th of 2005. That overlaps with both Ms. McGrain's tenure at the company. Mr. Wirtz was terminated after three months. If you look at James Johnson, another individual who was employed at Shreddick from January 3rd of 2006 to October 23rd of 2006, he was terminated as well, and this is all at page 186 of the record. The district court didn't point this out, but there were others. And so even Mr. Johnson's termination overlaps on Ms. McGrain and Ms. Grassmeyer's time at the company. So in addition to Mr. Peters, as the district court pointed out, during the time that they were there, there were two other males, Mr. Johnson and Mr. Wirtz, who were also terminated for failing to meet their sales quotas. And that leads me back to the first point that I started in this court's decision in Simpson, which when you read the Simpson opinion is directly on point to this case in a lot of ways. In that case, you had a female, or excuse me, an older female manager who was demoted and replaced by a younger manager. And what she argued is that she didn't get enough training, she didn't get enough supervision. The district court in that case showed that there was something like 30, 35 other managers over a three-year period under the age of 40 who were demoted for not meeting their sales quotas. What's your response to their laying out numbers for Mr. Bowser, Mr. Pavlicek, Mr. Papsen, I'm probably missing a name or two, all showing these guys came up short, significantly short, were not put on action plans, weren't given the same you're going to get fired kind of pressure that McGrane and Ryan were. First of all, Your Honor, Mr. Papsen was put on a final warning and he quit before he was fired, and that's at page 125 of the record. That happened on his 11th month, exactly the timing that this happened with Ms. McGrane. So those employees were being managed, they were being given warnings. And can you find months where maybe Mr. Bowser performed better than Ms. McGrane or vice versa? Sure, you can find those anomalies in the sales statistics, but at the end of the analysis, we have to go back to the plaintiff's own admissions in this case, that they flat out weren't meeting their sales quotas. They can't get over their own admissions. And the issue here isn't whether or not the sales quotas were fair, whether Shreddit was wise in adopting those sort of aggressive sales quotas. The issue is, are they being applied to everyone? And there's no evidence to suggest that they're not, based purely on the turnover in and of itself, and the record showing that other employees were not only being terminated, but were being disciplined for this conduct as well. With that, Your Honor, I believe I've addressed the Court's inquiries. If you have any other questions, I'd be happy to answer them. Otherwise, I'd ask that you affirm the decision of the lower court. Thank you. Thank you. Your Honors, unless the Court has questions of me on my reserve time, I have nothing further to add. Thank you. Case is well argued, taken under advisement.